J-A23014-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D.A., III, A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.M.A., MOTHER | | |
| | | No. 755 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0008a

| | | |
|---|---|---|
| IN THE INTEREST OF: E.J.A., A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.M.A., MOTHER | | |
| | | No. 756 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0009a

| | | |
|---|---|---|
| IN THE INT. OF: R.M.A., A MINOR | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.W.A., MOTHER | | |
| | | No. 757 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0010a

J-A23014-22

IN THE INT. OF: A.B.A., A MINOR : IN THE SUPERIOR COURT OF
                                 :        PENNSYLVANIA
                                 :
APPEAL OF: T.W.A., MOTHER        :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 : No. 758 MDA 2022

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0019a

IN THE INTEREST OF: B.W., A      : IN THE SUPERIOR COURT OF
MINOR                            :        PENNSYLVANIA
                                 :
                                 :
APPEAL OF: T.W.A., MOTHER        :
                                 :
                                 :
                                 :
                                 : No. 759 MDA 2022

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0007a

BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 14, 2023**

T.W.A. ("Mother"), appeals from the decrees entered on April 20, 2022,

which terminated involuntarily her parental rights to B.W., born in May 2014;

---

[*] Former Justice specially assigned to the Superior Court.

- 2 -

Ed.A., III, born in June 2015; R.A., born in June 2018; El.A., born in August 2019; and A.A., born in June 2021.[1] We affirm.

The York County Office of Children, Youth, and Families ("CYF") first became involved with the family in 2019 due to concerns with substance abuse by Mother and Father. A referral was made to CYF in August 2020 based on an allegation that they were abusing drugs and not properly disciplining or supervising the four oldest children. Those children were placed into care and adjudicated dependent on September 16, 2020. After A.A. was born, he was likewise placed into care and adjudicated dependent.[2]

_____

[1] We have adjusted the abbreviations used within this writing to align with those used by this Court in several related cases presently or recently before this Court. To wit, with respect to termination, E.A., Jr. ("Father"), El.A., and R.A., have also appealed, and those appeals are docketed at 683-687 MDA 2022, 740 MDA 2022, and 741 MDA 2022, respectively. Additionally, Father and Mother also appealed the goal change from reunification to adoption, docketed at 201-205 MDA 2022 and 295-299 MDA 2022, respectively. Finally, Father and Mother appealed from an order finding them both perpetrators of abuse as to B.W. and E.J.A. This Court stayed all matters, including the instant termination appeal, pending resolution of the abuse appeals. Ultimately, we affirmed the findings of abuse. *See Int. of B.W.*, 2023 WL 5526687 (Pa.Super. 2023) (non-precedential decision) (affirming the finding of abuse as to Father); *Int. of B.W.*, 290 A.3d 702, 2022 WL 17973239 (Pa.Super. 2022) (non-precedential decision) (affirming the finding of abuse as to Mother). Although the stay has been lifted in the termination matters, it remains active on the goal change appeals. Regrettably, the cumulative effect has been the tragic prolongation of several Children's Fast Track cases for this family, which are, by nature, meant to be resolved quickly by this Court for the benefit of the impacted children.

[2] All five children were eventually placed in the same pre-adoptive resource home, where they remained together at the time of the termination hearing.

- 3 -

As a result of the dependency adjudications, Mother was ordered to, *inter alia*, cooperate with both announced and unannounced home visits by CYF; complete a mental health evaluation and follow treatment recommendations; actively participate in services; obtain employment and provide proof of income to CYF; maintain safe, clean, and appropriate housing; submit to random drug testing; and continue her drug and alcohol treatment and participation in the methadone program. **See** Family Service Plan, 10/2/20, at 14, 16-18; **see also** Family Service Plan, 3/12/21, at 14 (adding, among other things, that Mother notify CYF of any change in household members and attend medical appointments for the children); Family Service Plan, 8/9/21 (same, issued following A.A.'s birth and adjudication of dependency).

Meanwhile, in the companion dependency matters, allegations of physical abuse were made against Father and Mother in December 2020 and January 2021, as to B.W. and El.A., leading to an abuse investigation. The report included allegations that the parents slapped the children with an open hand and also with a belt, including when El.A. was less than one month old. This Court recounted the testimony offered at the March 10, 2022 finding of abuse hearing as follows:

> The [Child Advocacy Center] forensic interviewer. . . testified: "B.W. disclosed being beat — his words — that El.A. was slapped with a belt," Father beat R.A. and El.A., Mother slapped B.W., and B.W. observed potential drug use. B.W. further reported El.A. suffered injuries, including bleeding from the mouth.

CYF Caseworker [Kristen] Marshall, who observed the interview, testified:

> B.W. disclosed that he and his siblings were being punished with a black belt with little spikes on it. He reported that it was hurtful. B.W. actually stated it hurt more than a gun. He stated the spikes were sharp and caused him to bleed. He stated he would cry and he was hit over and over. The very red marks like — were left like it was bleeding, but it wasn't. And he stated that both parents would hit him.

> CYF additionally entered into evidence the forensic interview summary and a DVD video of the forensic interview. Ms. Marshall sought, but did not receive, medical records that might show physical injury to B.W. She also attempted multiple times to schedule an interview with Mother and Father, but was unsuccessful.

> With respect to El.A., Ms. Marshall testified that B.W. stated Mother and Father sometimes slapped El.A., so there was blood under his tongue, and that El.A. would cry a lot and neighbors would hear. As stated above, B.W.'s statements led to a referral as to El.A. An investigation revealed El.A. was taken to the York Hospital emergency room for bleeding from the mouth in August 2019 when he was less than a month old.

***Int. of B.W.***, 290 A.3d 702, 2022 WL 17973239, at *2-3 (Pa.Super. 2022) (non-precedential decision) (cleaned up). Following a prolonged investigation, partially due to the parents' refusal to submit to police interviews, the court found both Mother and Father to be perpetrators of abuse against B.W. and El.A. As noted, this Court affirmed those findings.

On January 19, 2022, CYF filed petitions to terminate Mother's rights to all five children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (5). As to the four oldest children, B.W., Ed.A., R.A., and El.A., CYF also sought termination pursuant to § 2511(a)(8).

The court held hearings on the petitions on April 1 and 18, 2022.[3] With respect to Mother, CYF presented the testimony of Ms. Marshall, the family advocate and family therapist from Pressley Ridge, and Mother's methadone counselor at Pyramid Healthcare and recovery specialist at RASE Project. Through their testimony, it was relayed that Mother had been consistent with her visits with the children and had made significant progress resolving her substance abuse. However, as of the first day of the hearing, CYF remained concerned because Mother had not alleviated the environmental concerns at the house, made progress in her mental health treatment, or established financial stability. Additionally, visits had not progressed beyond supervised, and Mother recently tested positive for alcohol, which particularly concerned CYF given her addiction issues and the serious medical consequences of mixing methadone with alcohol.

At the second hearing, over two weeks later, Father and Mother testified. During the gap between hearings, Mother re-initiated mental health treatment and the family therapist visited the home during a scheduled visit. Mother attempted to demonstrate that the house had since been made appropriate for reunification through her own testimony and by recalling the family therapist. Mother also explained her work history, the utility payments at the house, and her attendance at medical appointments for the children.

---

[3] At the termination hearing, each child had their own attorney representing their respective legal interests. David Worley, Esquire, collectively represented the best interests of all five children as their guardian *ad litem* ("GAL").

Father, in pertinent part, presented testimony from another CYF caseworker regarding Ms. Marshall's alleged bias.

The children's GAL argued that termination was in the best interests of each child. Specifically, the GAL was concerned that the physical abuse had been unaddressed and was wary of the last-minute efforts by the parents to finally re-initiate mental health treatment and attempt to make the home environment appropriate. Through legal counsel, the children expressed the following: B.W. wanted to return to his parents; Ed.A. wished to remain in the foster home and not return to his parent's home;[4] El.A., despite the finding of abuse, had a strong bond with his parents and would oppose termination; R.A. also had a strong bond with her parents and would oppose termination; and A.A., given his young age, could not express a legal position different from that expressed by the GAL.

At the conclusion of the hearing, adopting the GAL's concerns, the orphans' court terminated Mother's parental rights as to all five children, and issued separate orders changing each child's permanency goal to adoption. Mother timely filed a notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2). The orphans' court complied with Rule 1925(a). Mother presents the following issues for our consideration:

---

[4] Given the bond between Ed.A. and his parents, Ed.A.'s attorney interpreted his wish not to return to his parents' home as a request for more time for Mother and Father to continue to make progress and not as a request for termination of their parental rights.

- 7 -

I.    Whether the [orphans'] court erred as a matter of law and/or abused its discretion by finding under 23 Pa.C.S. § 2511(a)(1) that Mother, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, either evidenced a settled purpose of relinquishing parental claim to the child and/or has refused or failed to perform parental duties[.]

II.   Whether the [orphans'] court erred as a matter of law and/or abused its discretion by finding under 23 Pa.C.S. § 2511(a)(2) that sufficient evidence showed repeated and continued incapacity, abuse, neglect, or refusal of Mother caused the child to be without essential parental care, control, or subsistence necessary for the physical or mental well-being and that the conditions and causes of any incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother[.]

III.  Whether the [orphans'] court erred as a matter of law and/or abused its discretion by finding under 23 Pa.C.S. § 2511(a)(5) that the child was removed from the care of Mother for a period of six months and the conditions that led to the removal continue to exist and the Mother cannot or will not remedy those conditions in a reasonable period of time and termination will serve the needs and welfare of the child[.]

IV.   Whether the [orphans'] court erred as a matter of law and/or abused its discretion by finding under 23 Pa.C.S. § 2511(a)(8) that the child was removed for twelve months or more and the conditions which led to the removal continue to exist and termination best serves the needs and welfare of the child[.]

V.    Whether the [orphans'] court erred as a matter of law and/or abused its discretion by finding under 23 Pa.C.S. § 2511(b) that termination will help the physical and emotional needs and welfare of the child when there was direct testimony to the contrary[.]

VI.   Whether the [orphans' court erred as a matter of law and/or abused its discretion when it accepted the testimony of the biased caseworker despite testimony from multiple other sources that disputed said caseworker.

- 8 -

VII. Whether the [orphans'] court erred as a matter of law and/or abused its discretion when it failed to take into account that the parents were stymied from progress due to an open investigation from approximately January 2021 until January 2022[,] during which [CYF] refused to progress contact between Mother and child but failed to progress the investigation of abuse.

VIII. Whether the [orphans'] court erred as a matter of law and/or abused its discretion in terminating [Mother's] parental rights when it failed to account for the regular and consistent progress made by the parents.

Mother's brief at 4-6 (cleaned up).[5]

We begin with whether there was statutory support for termination and set forth our well-settled standard of review:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However,

_____

[5] The GAL for all five children, CYF, and legal counsel for B.W. and Ed.A., respectively, filed a single, collective brief in support of affirming the orphans' court's decrees.

we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). **T.B.B.**, **supra** at 395. Mother asserts that CYF failed to establish by clear and convincing evidence the statutory grounds for termination of her parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). To affirm a decree terminating parental rights, we need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We focus our analysis for all five children on § 2511(a)(5)[6] and (b), which provide as follows:

---

[6] We cannot countenance the dissent's constrained interpretation that because A.A. was placed into care following his birth, he was never in Mother's care and therefore, because he was not "removed" from her care, § (a)(5) cannot apply. **See** Dissent at 20-21. Our Court has held that § (a)(5) does not apply when a child is removed while the parent is incarcerated. **See In re C.S.**, 761 A.2d 1197, 1200 (Pa.Super. 2000) (*en banc*). In such a scenario, the parent could not have exercised custody, regardless of whether they were otherwise capable. Respectfully, that is not the case here. Mother was not incarcerated at the time of A.A.'s birth such that it was impossible for her to have custody of A.A. Both Father and Mother were available to take custody of A.A. and would have, in fact, been in custody of A.A. **but for** his removal by CYF at the hospital. In other words, despite A.A. not being removed from the home of Father and Mother, he was clearly removed from their care at the time of his birth. That is consistent with both the statutory language and our case law. **See e.g.**, **In re Adoption of J.J.**, 515 A.2d 883, 889-890 (Pa. 1986) (affirming termination pursuant to § (a)(5) where child had been under the care of the agency since his birth and where the father had "never had custody of, nor provided support for, [the] child"). Accordingly, we find no impediment to applying § (a)(5) as to A.A.

- 11 -

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Pursuant to this framework, we first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to § 2511(a)(5). Termination under this subsection requires that the moving party prove the following elements:

> (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re B.C.*, 36 A.3d 601, 607 (Pa.Super. 2012) (citation omitted).

Mother argues that the adjudication for the four oldest children was based upon concerns regarding her drug abuse, which she correctly argues she has addressed. *See* Mother's brief at 25. As to A.A., she notes that while his adjudication order referenced the abuse investigation, no additional goals were added with respect to the abuse allegations, no concerns of abuse were raised during visits, and visits could not progress beyond supervised because CYF delayed the investigation. *Id*. As to the environmental concerns and financial stability, Mother points to testimony from a January 11, 2022 hearing that a Pressley Ridge worker deemed the house appropriate, and claims that she provided income documentation to that same individual. *Id*. at 26.

While Mother urges us to accept the testimony that favored her assertion that the environmental issues had been resolved and financial documentation had been provided to one of the service team members, it was wholly within the province of the orphans' court to make credibility determinations regarding the testimony offered. Those credibility determinations are supported by the record and therefore remain undisturbed. *See M.G.*, *supra* at 73-74; *T.B.B.*, *supra* at 394. Accepting these credibility

- 13 -

determinations, our review of the certified record indicates that it was not solely the inability to provide financial documentation that supported termination. Rather, it was the failure to demonstrate the ability to provide safe and stable care for the children, as evidenced by the housing concerns, Mother's declining to take seriously the mental health treatment, and lack of evidence of a stable income to support five children.

Ms. Marshall, who had been assigned to the case since October 2020, testified that Mother's primary concerns at adjudication were substance abuse, environmental issues in the home, mental health, and drug testing. *See* N.T. Hearing, 4/1/22, at 197. With regard to the environmental issues, as noted hereinabove, Mother's goals included complying with unannounced and announced home visits by CYF, maintaining safe appropriate housing, and performing routine housekeeping.

During Ms. Marshall's tenure, she attempted to make eight home visits. In November 2020, there were lice issues, the heavy smell of animal feces and urine smell, and problems with the toilet, stairwell railing, and one of the bedroom floors. At the next two visits, both in December 2020, the toilet and railing issues had been repaired. In January 2021, she was unable to enter the house due to COVID-19 concerns and lice. In July 2021, a proxy visited the house but was not permitted inside. Nonetheless, the proxy noted that it smelled like garbage outside and the front porch was messy. In August 2021, Ms. Marshall was denied entry into the house but noted a strong smell of animal feces when the door was opened. Again, in January 2022, she was not

allowed into the house to conduct a home visit. Her last visit was conducted on March 24, 2022. *See* N.T. Hearing, 4/18/22, at 46-47.

During the last visit, which was unannounced, Mother was away from the home, but returned when called and was inside for a few minutes before admitting Ms. Marshall and her supervisor into the home. There was a potent smell of animal feces and urine, feces in the kitchen trash, a dog peeing sporadically in the house, space heaters throughout the home, including one on top of a laundry basket filled with clothes, no sink in the only bathroom, concerns with water damage in the parents' bedroom, and animal feces in one of the children's rooms. *See* N.T. Hearing, 4/1/22, at 200-203.

Turning to the elements of § 2511(a)(5), Mother does not contest that all five children were removed from her care for a period exceeding six months. Therefore, the first element is satisfied. As to the second, third, and fourth elements, the initial placement was based upon concerns about Mother's drug use, inappropriate parenting, unstable employment, unsafe housing, and the need for mental health treatment. Once there were allegations and findings of abuse, that naturally became part of the concerns as to Mother's parenting and ability to provide a safe home environment. The orphans' court concluded that while Mother had made progress with regard to her drug treatment and the methadone program, she could not remedy the remaining conditions leading to adjudication within a reasonable amount of time. *See* Orphans' Court Opinion, 6/17/22, at 32.

As the record shows, the children were removed from Father and Mother for more than parents' drug use or Father's overdose. CYF received a referral several days prior to Father's overdose. CYF had prior history with the family and feared Mother would revoke the safety plan implemented for the children's welfare. From the outset, the revised safety plan, dated October 2, 2020, provided objectives that are not beyond the control of the parents related to cooperating with agency services, gaining employment and financial stability, providing proof of income, securing appropriate housing and sleeping quarters for the children, routine housekeeping, and methadone treatment, etc.

Furthermore, the allegations of physical abuse by B.W. and the finding of abuse raise safety concerns regarding the children. The parents' consistent denials that anything happened regarding the finding of abuse is concerning. During the period that the children have been outside of the home, a report to the court for a permanency review hearing indicated that Father often escalates to yelling and cursing during team conversations. On August 31, 2021, the Catholic Services Intensive Family Services Team closed out services and recommended anger management because Father was inappropriate. In September 2021, Mother reported that an argument escalated to the point that her mother threatened to file a protection from abuse order against her. In October 2021, Father pleaded *nolo contendere* to disorderly conduct for fighting for 12 months' probation. The court is not aware of the date of the specific disorderly conduct. However, these other instances occurred after or while Mother and Father were receiving various services and raise concerns regarding the safety of the children.

The children were removed from the home for more than six months. They have been removed for almost twenty months at this time. Parents certainly made progress with regard to the methadone program as required by the family service plan cited. The parents could not remedy the remaining conditions within a reasonable time. Given that parents have had some services close unsuccessfully or declined, it is not likely that available services will remedy the remaining conditions that led to the removal or placement of the children within a reasonable period of time. . . . [T]he court believes termination serves the best interests of the children who require permanency.

*Id*. at 30-32 (cleaned up).

- 16 -

While Mother made significant progress towards alleviating her drug addiction concerns and should be commended for doing so, the children were not removed solely on the basis of her substance abuse. Mother has failed to make sufficient progress towards her remaining goals, namely, correcting the environmental concerns in the home, demonstrating financial stability, and engaging with mental health treatment to address, *inter alia*, the abuse.

> [T]he statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Therefore, we conclude that the orphans' court did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(5) as to B.W., Ed.A., R.A., El.A., and A.A.

Turning to § 2511(b), we again set forth the guiding principles:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs

- 17 -

and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Int. of K.T.*, 296 A.3d 1085, 1105–06 (Pa. 2023) (cleaned up).

This Court has emphasized that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013). "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail. . . the result, all too often, is catastrophically maladjusted children." *Id*. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

The certified record supports the orphans' court's conclusion that termination was in the best interests of all five children as it relates to Mother. Notably, the GAL for all five children advocated in favor of termination as being in their best interests. *See* Appellees' brief at 28 (arguing that termination is in the best interests of the children). The court acknowledged the bond between the children and Mother, and that Mother has made progress towards some of her goals. However, the court held that it "cannot and will not

subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." Orphans' Court Opinion, 6/17/22, at 38 (quoting **R.J.S.**, **supra** at 513). As the children are together, safe, and bonded with their foster mother, the court concluded that it was in their best interests to terminate Mother's parental rights so that the children could achieve permanency. **Id**. at 38-39. We discern no abuse of discretion in the court's decision in that regard.

Mother raises a separate claim that the orphans' court erred in crediting Ms. Marshall's testimony over that of conflicting individuals. However, because we find support for the orphans' court's credibility determinations with regard to Ms. Marshall's testimony, no relief is due.

Mother next argues that the orphans' court failed to consider that progress in visitation was "stymied" as a result of the open abuse investigation that CYF delayed. She alleges that "by letting the investigation pend for approximately one year then using that as reason that the parents could not proceed to partial or in-home visitation, it is clear that CYF lacked food faith." Mother's brief at 35. According to Mother, the Pressley Ridge witnesses indicated that they had been agreeable to progressing visitation but could not because of the ongoing abuse investigation. **Id**.

The orphans' court, in its Rule 1925(a) opinion, set forth how Mother's allegations were belied by the record. First, CYF continued to provide services during the investigation and the court increased the amount of visitation. **See** Orphans' Court Opinion, 6/17/22, at 36. As to the lack of progress to partial

or in-home visitation, the Pressley Ridge witnesses testified that the open investigation was only one of the reasons and they would only have been comfortable with partially-supervised visits at the time of the termination hearing. *Id*.

Our review of the record supports the orphans' court's conclusions. Certainly, the abuse allegations were one factor against moving to partially-supervised visits. *See* N.T. Hearing, 4/1/22, at 207-08. However, it was not the only reason. As noted by Ms. Marshall, the visits were not moved to partially supervised because of the open abuse investigation, the condition of the house remained inappropriate, the parents' difficulties in setting boundaries during visits, and generally insufficient progress with their parenting goals. *See* N.T. Hearing, 4/18/22, at 68-69.

Ms. Marshall's testimony was supported by that of the Pressley Ridge witnesses. The family advocate, Michele Mahoney, testified that the original concern necessitating supervised visits was parenting capacity of Mother and Father. *See* N.T. Hearing, 4/1/22, at 56. The parents demonstrated an improved ability to control visits after therapy started in September 2021, and at the time of the termination hearing, would now be amenable to partially-supervised visits. *Id*. at 56. Likewise, the family therapist, Jessica Myers, testified that a second supervisor was added to the visits because there were concerns with the parents whispering to the children, as well as for someone to monitor B.W.'s mental health during visits. *Id*. at 77-78. The whisperings and potentially manipulative conversations were one of the reasons that visits

had not progress to partially supervised. *Id*. at 109. Nonetheless, she testified that, at the time of the termination hearing, she would support partially-supervised visitation. *Id*. at 107.

Even if the open investigation had been the only reason preventing visits progressing to partially supervised, that was not the sole fault of CYF. Ms. Marshall explained the procedure regarding open abuse investigations, and that the police must initially conduct interviews in order to move the investigation along. Father and Mother refused to participate in those interviews. Once Ms. Marshall was directed by the court in November 2021 to proceed without the benefit of those interviews, she completed the abuse investigation by January 11, 2022. *See* N.T. Hearing, 4/18/22, at 63-64; *B.W.*, *supra* at *2. While parents may have wished for Ms. Marshall to assume control of the investigation more quickly, it was their refusal to participate that stalled the investigation. Once Ms. Marshall conducted the investigation, it appears to have been completed with expediency. Therefore, Mother is not entitled to relief on this claim.

Finally, Mother argues that the orphans' court, instead of focusing on where the parents erred, should have commended them for the progress they did make "given the circumstances of a caseworker that refused to work towards reunification, and a stalemate in visits created by a battery of CPS investigations that supposedly occurred prior to the children's adjudication." Mother's brief at 36. Our review of the record indicates that the orphans' court **did** acknowledge the progress that the parents had made, particularly with

their drug treatment, but nonetheless concluded that termination was warranted and in the best interests of the children. **See e.g.**, Orphans' Court Opinion, 6/17/22, at 38 ("Along with the drug issue, for which there was great progress, these other conditions, which were part of the conditions that led to the removal or placement of the children, continued to exist."). Accordingly, Mother's final issue likewise garners no relief.

As detailed hereinabove, the facts as found by the orphans' court are supported by clear and convincing evidence. Its conclusions are free from legal error and, in our review, are not manifestly unreasonable, or the subject of partiality, prejudice, bias, or ill-will. **See C.M.**, **supra** at 359. In light of our deferential standard of review, we find no abuse of discretion, and affirm the decrees terminating Mother's parental rights as to B.W., Ed.A., R.A., El.A., and A.A.

Decrees affirmed.

P.J.E. Stevens joins this Memorandum.

Judge McCaffery files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/14/2023